**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | | |
|---|---|---|
| **ASHLEY D. DIGGS** | : | |
| **9810 New Orchard Drive** | : | |
| **Upper Marlboro, Maryland 20774** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **Case No. 20-3369** |
| | : | |
| **ENTERCOM COMMUNICATIONS CORP.** | : | |
| **401 E. City Avenue, Suite 809** | : | |
| **Bala Cynwyd, PA 19004** | : | **JURY DEMANDED** |
| | : | |
| **Serve on:** | : | |
| **CT Corporation System, Resident Agent** | : | |
| **1015 15th Street NW, Suite 1000** | : | |
| **Washington, D.C. 20005** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **ENTERCOM WASHINGTON DC, LLC** | : | |
| **2400 Market Street, 4th Floor** | : | |
| **Philadelphia, PA 19103** | : | |
| | : | |
| **Serve on:** | : | |
| **CT Corporation System, Resident Agent** | : | |
| **1015 15th Street NW, Suite 1000** | : | |
| **Washington, D.C. 20005** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

COMES NOW, Ashley D. Diggs, through undersigned counsel and sues Defendants,

Entercom Communications Corp. ("Entercom Communications") and Entercom Washington

DC, LLC ("Entercom DC") (collectively, "Entercom") for the causes of action stated as follows:

## INTRODUCTORY STATEMENT

1.     Plaintiff Ashley Diggs brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. 2000e, *et seq.* for relief from sexual harassment, sexual assault, hostile work environment, discrimination, retaliation and constructive discharge during the course of her employment with Entercom as a producer at radio station WPGC 95.5 in Washington, D.C.

2.     Entercom discriminated against Plaintiff Ashley Diggs.  Ms. Diggs was subjected to a hostile work environment, sexual harassment and sexual assault.  When Ms. Diggs complained about the discriminatory and predatory conduct directed towards her by an on-air talent, Entercom retaliated against her and constructively discharged her for bringing forward those complaints.

## PARTIES

3.     Plaintiff Ashley Diggs is an African American woman who currently resides at 9810 New Orchard Drive, Upper Marlboro, Maryland 20774.  At all relevant times, Ms. Diggs was an employee of Entercom.

4.     Defendant Entercom Communications is a Pennsylvania corporation registered to do business in Washington, D.C.

5.     Entercom Communications, through its operating subsidiaries, owns and operates approximately 235 radio stations in 48 markets throughout the United States and is one of the nation's largest radio broadcasting companies.

6.     Defendant Entercom DC is a Pennsylvania corporation registered to do business in Washington, D.C. and operates six (6) radio stations in the Washington D.C. area, including WPGC 95.5, where Ms. Diggs was employed.

7.     Entercom DC is a wholly-owned subsidary of Entercom Communications.

8.     Defendants are liable for the discriminatory acts or omissions of their agents, servants and/or employees while acting within the course and scope of their employment.

## JURISDICTION

9.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as claims are asserted that arise under the Constitution, laws or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

10.     This Honorable Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367, as it asserts claims that arise under the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq.*

11.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

## VENUE

12.     Venue is proper in this Court as events relevant to the claims alleged herein occurred within the District of Columbia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.     Plaintiff Ashley Diggs has exhausted all of her administrative remedies.

14.     Ms. Diggs filed a timely charge with the United States Equal Employment Opportunity Commission ("EEOC") for sex discrimination; sexual harassment; retaliation; hostile work environment; unlawful termination; and constructive discharge. Ms. Diggs was issued a Notice of Right to Sue from the EEOC. This action was filed within ninety (90) days of receipt of that notice dated August 24, 2020.

## FACTS

15.     Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations in the preceding paragraphs, as fully set forth herein.

16.     Plaintiff Ashley Diggs began her employment with Entercom's predecessor, CBS Radio, in 2012 as an Associate Journalist on-air at WNEW 99.1 FM.

17.     At the time that Entercom purchased CBS Radio, Ms. Diggs was working for WPGC 95.5 FM in the Promotions department as a Promotions Team Member.

18.     Thereafter, Ms. Diggs transitioned to Programming.  It was in this position that she worked with on-air talent Antonio Lovett a/k/a Tony Redz a/k/a Mr. 24/7, as the night show producer/board operator beginning in 2015.

19.     When Ms. Diggs was hired by CBS Radio, predecessor of Entercom, Kevin Johnson, a/k/a/ DJ Akademiks was already employed by CBS Radio as on-air talent.  At all times relevant to the allegations herein, Mr. Johnson was an agent, employee and/or servant of Defendants.

20.     On or about June 9, 2016, Ms. Diggs complained to her supervisor Angelique Alston, Assistant Program Director and Executive Morning Show Producer, about Mr. Johnson's sexually charged and predatory behavior towards her.

21.     At that time, Plaintiff told Ms. Alston that on the evening of June 9, 2016, at the Howard Theater during the WPGC Birthday Bash, Mr. Johnson licked Ms. Diggs on her face after getting very close to her.  Although Ms. Diggs reported Mr. Johnson's inappropriate conduct to Ms. Alston, Plaintiff is not aware that any disciplinary action was imposed on Mr. Johnson.  Ms. Alston told Plaintiff that she would speak with Mr. Johnson about his actions.

22.     Ms. Alston recognized that Mr. Johnson's behavior was problematic, informing Plaintiff that "damn Akademiks is always getting into some shit."

23.     Plaintiff also complained to Mr. Redz, with whom she worked, about Mr. Johnson's inappropriate and unlawful behavior.  Although Mr. Redz expressed his anger towards Mr. Johnson's sexually inappropriate behavior, Plaintiff is not aware what, if any, action that was taken to address Mr. Johnson's inappropriate and unlawful behavior.

24.     On September 26, 2017, Ms. Diggs arrived at the radio station to work and was confronted with Mr. Johnson having sex with a woman in the station area inside the DJ booth. Ms. Diggs informed Mr. Redz about the incident and Mr. Redz said that he had also witnessed Mr. Johnson having sex in the studio before as well.

25.     Beginning around June 9, 2016 forward, Mr. Johnson touched and groped Plaintiff by grabbing and rubbing her arms and back; putting his arms around her; and giving her uninvited and unwanted hugs.  In addition, Mr. Johnson would say to Ms. Diggs as he was touching and groping her that "you know you like that," and would imply that Plaintiff wanted to have sex with him.

26.     On October 1, 2017, Ms. Diggs complained to Mr. Redz about Mr. Johnson's sexual harassing of her.  Mr. Redz indicated to Ms. Diggs that Mr. Johnson would harass other women who worked with the radio station, including a woman who worked on the street team. Mr. Redz indicated to Ms. Diggs that Mr. Johnson "was doing the same shit he was doing to that other girl," and he informed Plaintiff that Ms. Alston knew about this harassment as well.

27.     Mr. Redz informed Ms. Diggs that if Ms. Diggs complained to Ms. Alston or any other authority at the station, the station would just fire Ms. Diggs because she was not on-air talent.

28.     Thereafter, Mr. Redz promised Plaintiff that he would not take vacation time because the radio station would have Mr. Johnson cover Mr. Redz' on-time spot.

29.     Mr. Johnson's sexual harassment continued.  He would ask Plaintiff,  "is your ass real?" and "would you come out with me tonight?" Mr. Johnson repeatedly told her that: "you know you want it;" and "I'm going to the club, you should come with me."

30.     At times, Mr. Johnson would push Ms. Diggs into a corner near the Vox Pro (system used to change people's voices in the studio) and get close to her with his body touching hers, completely up against her so that she could not move or remove herself from the situation. Mr. Johnson's inappropriate and unlawful behavior was unwelcomed and unwanted.

31.     At times, Mr. Johnson would drink alcohol while working at the radio station. Drinking while on-air was against company policy.  During those times, Mr. Johnson would become even more touchy towards Plaintiff, including putting his hand right above her buttocks on the small of her back.

32.     Ms. Diggs complained to Ms. Alston and informed her of Mr. Johnson's continued behavior; however, no action was taken.  Instead, Ms. Alston informed Plaintiff that Ms. Diggs did not have to come into work if she was uncomfortable with Mr. Johnson.  Plaintiff was not made aware of any disciplinary action taken by Defendants to address Mr. Johnson's behavior.

33.     What became clear to Plaintiff is that Ms. Alston and Defendants were protecting the on-air talent, Mr. Johnson at her expense.

34.     In April 2019, Entercom released Mr. Redz and in his time slot Entercom had various, non-permanent, on-air personalities fill the evening radio slot.  Ms. Diggs continued to work as producer with Entercom after Mr. Redz was released.

35.     Mr. Johnson was one of the on-air personalities that Entercom had periodically fill the evening radio programming slot.

36.     Beginning almost immediately thereafter, in or about April 2019, Mr. Johnson took a more focused interest in Plaintiff, directing even more inappropriate and lewd comments towards her.  Mr. Johnson directed badgering and belittling statements at Ms. Diggs about sex and sexual favors that she could perform on and/or to Mr. Johnson if she wanted to keep her position as a producer for the evening programming.

37.     Among other things, Mr. Johnson stated to Ms. Diggs that the only reason that she was the producer of the night show was because she had been sexually involved with Mr. Redz. These statements and allegations by Mr. Johnson were completely false and were nothing more than sexual harassment and meant to demean Ms. Diggs and her position as a producer.

38.     Mr. Johnson attempted to use his position as an on-air personality to coerce Plaintiff into having sex with him and/or performing sexual favors for him in order for her to retain her job.

39.     Plaintiff again complained to her supervisor, Ms. Alston about Mr. Johnson's behavior.  Plaintiff is not aware that Ms. Alston took any action to address Mr. Johnson's behavior.

40.     At that same time and at times thereafter, when Mr. Johnson would fill the evening on-air spot, he would ask Ms. Diggs sexually inappropriate questions about what else Ms. Diggs was willing to do to keep her job as the night producer now that Mr. Redz was gone, suggesting that she should perform sexual favors for him to keep her job.

41.     Mr. Johnson told Ms. Diggs that there were others at the station who would be willing to perform sexual favors for him to have her job, implying that if she did not perform

sexual favors for Mr. Johnson that she would lose her position.  Specifically, one night in the radio studio, during the evening spot in-between a break, Mr. Johnson told Ms. Diggs that he was going to take over the evening on-air spot full-time and that he wanted somebody who was willing to do things for him.  When Plaintiff questioned what he meant, Mr. Johnson opened his arms wide, stepped back and said, "whatever it takes."  Mr. Johnson told Plaintiff that another woman who worked at the studio in the promotions department wanted to work with Mr. Johnson to obtain more skills and wanted Plaintiff's job.  Mr. Johnson informed Plaintiff that the other woman was willing to do whatever it took for her to get the job.

42.     Mr. Johnson also asked Ms. Diggs about what else she did to make money, implying that she got paid for sex.

43.     Mr. Johnson's inappropriate, aggressive and harassing comments caused a sexually charged and unwelcome working environment at Entercom for Plaintiff.

44.     Working with Mr. Johnson became untenable for Ms. Diggs, causing her severe anxiety and insecurities about her job and status at Entercom.

45.     Because Mr. Johnson's behavior progressed towards even more sexually harassing after he became one of the on-air evening personalities, Plaintiff attempted to work different shifts at the station to avoid Mr. Johnson, but that was not always possible.

46.     On July 22, 2019, Plaintiff was working as the night producer when Mr. Johnson was a stand-in as the on-air personality.

47.     During the show, Mr. Johnson had another woman in the studio with him and was drinking Tequila while on-air, purportedly to celebrate his "birthday week."  Statements made by Mr. Johnson that week on social media included:  "BIRTHDAY WEEK starting Monday and I got some surprises we bout to F$&K DC. Up all week long details coming soon…."

48.     Mr. Johnson then coerced Ms. Diggs to come into the studio to drink Tequila shots with him while they were working.  Ms. Diggs refused, but to avoid a scene on live radio as Mr. Johnson was clearly intoxicated, she went into the studio, per usual, to produce the show. Ms. Diggs did not drink the Tequila shot that Mr. Johnson gave her.  It was clear to Plaintiff that Mr. Johnson was drunk on the air, a violation of the station policy.

49.     As Ms. Diggs was leaving the studio, Mr. Johnson slapped her on her buttocks. This unwanted and demeaning action by Mr. Johnson caused Ms. Diggs to feel humiliated and victimized by Mr. Johnson.

50.     Because of Mr. Johnson's on-air intoxication, he missed multiple paid commercial spots during the radio show that Ms. Diggs had to correct.

51.     Mr. Johnson also asked Ms. Diggs to go out with him after the show, however, when the show ended at 10:00 p.m., Ms. Diggs left the studio immediately and called Ms. Alston from the parking lot to report Mr. Johnson's unlawful behavior.

52.     Plaintiff was physically and emotionally shaken by what had transpired that evening with Mr. Johnson.

53.     Plaintiff told Ms. Alston that since April 2019, Mr. Johnson had asked her inappropriate and sexually suggestive questions and had told her that she, Ms. Diggs, would not continue as the producer of the night show if she did not engage in sexual relations with him.

54.     Ms. Diggs explained to Ms. Alston what had occurred during those times that Ms. Diggs worked with Mr. Johnson, the sexually inappropriate and harassing behavior, and his behavior that evening.

55.     Plaintiff reminded Ms. Alston that she had previously complained about Mr. Johnson's inappropriate and sexually harassing behavior.

56.     As it was late, Ms. Alston told Plaintiff that she would contact her the next morning to discuss the matter further.

57.     Ms. Alston called Plaintiff the next day and asked Ms. Diggs how she wanted to proceed with her claims.  Ms. Diggs informed Ms. Alston that she wanted to move forward with her complaints.

58.     Plaintiff was then informed that there would be a meeting between Ms. Alston, Ms. Diggs and Steve Davis, Vice President of Programming/Program Director to address the complaints made by Ms. Diggs against Mr. Johnson.

59.     On July 30, 2019, Plaintiff met with Ms. Alston and Phil Zachary, Senior VP of Entercom.  Mr. Davis did not attend the meeting.  At the meeting, Ms. Alston and Mr. Zachary informed Ms. Diggs that Mr. Johnson's unlawful behaviors, including the sexual harassment and sexual assault that she had complained to Ms. Alston about were nothing more than a "miscommunication."

60.     Ms. Alston and Mr. Zachary informed Ms. Diggs that Entercom had conducted an investigation, without speaking with Plaintiff, and as a result of that investigation had suspended Mr. Johnson for one week for his on-air drunkenness, but not for his unlawful behavior towards Ms. Diggs, including the sexual harassment and sexual assault.

61.     Mr. Zachary also told Ms. Diggs during that meeting that Entercom did not fire Mr. Johnson because they "didn't want to end a man's career."

62.     Mr. Zachary further told Plaintiff that Entercom's investigation did not produce information that could definitively support Plaintiff's allegations of sexual harassment.  Neither Ms. Alston nor Mr. Zachary told Plaintiff the scope of the investigation, who was interviewed,

why she was not interviewed, or who had "conducted" the investigation, among other information.

63.     Plaintiff informed Mr. Zachary and Ms. Alston that she did not want to work with Mr. Johnson again.

64.     Mr. Zachary informed Plaintiff that he and Ms. Alston would see what they could do and then informed Ms. Diggs that they would both be on vacation the next two weeks.  Ms. Diggs inquired as to whether she was to be paid during the time that both Mr. Zachary and Ms. Alston were on vacation and she was not at the radio station.  Ms. Alston indicated that she would make sure that Ms. Diggs "was working."

65.     However, that did not occur; rather, Entercom retaliated against Plaintiff for complaining about sexual harassment in the workplace committed by on-air talent; sent her home; gave her no hours to work; and left her with no paycheck.

66.     In mid-August, when Ms. Diggs asked Ms. Alston why she was not working, she was offered a position at the station as a "researcher."  That position, which is an assistant position without a job description or specific duties, was a demotion from her position as a producer.  Ms. Diggs declined to accept the demotion.

67.     Entercom did not pay Ms. Diggs for the time that she was sent home while Ms. Alston and Mr. Zachary were on vacation, even after assuring Ms. Diggs that she would continue to be given hours to work.

68.     Ms. Alston then contacted Plaintiff and requested that she come in to meet with her and Mr. Zachary again.  On September 5, 2019 Ms. Alston, Ms. Diggs and Mr. Zachary met. Plaintiff had not worked any hours since July 22.

69.     Mr. Zachary stated at the outset of the meeting that he believed that Ms. Diggs did not want to work with Mr. Johnson any longer and that he would find her another position at the studio.

70.     Mr. Zachary made it sound as if Entercom was doing Plaintiff a favor by "finding" her a position within the company that did not require her to work with her sexual harasser, Mr. Johnson.

71.     Mr. Zachary then informed Plaintiff that if she did not take the demotion to a researcher, there was nothing further that Entercom could or would do for Ms. Diggs.

72.     Entercom refused to remove Mr. Johnson as on-air talent during the evening time slot.  Rather, Defendants, Ms. Alston and Mr. Zachary determined that Plaintiff needed to go.

73.     Mr. Zachary became confrontational during the meeting.  He refused to reinstate Ms. Diggs to her position as a producer at the radio station.  He belittled Ms. Diggs during the meeting and questioned why Ms. Diggs would want to remain at the station where her sexual harasser worked.

74.     Mr. Zachary was demeaning and dismissive of not only Ms. Diggs complaints of the sexually harassing behavior, but of Plaintiff personally.

75.     Entercom retaliated against Ms. Diggs for her complaints against Mr. Johnson: Mr. Johnson continued with his job at Entercom and Ms. Diggs was ostracized from the radio station for her complaints and constructively fired when she refused to accept a demotion.

76.     Mr. Zachary's behavior at the meeting and Entercom's conduct have been unlawful and belie any decency or correctness in how Plaintiff and her complaints should have been handled.

77.     Based on social media posts by Mr. Johnson and others, Mr. Johnson is still employed with Entercom and is still identified as the night-time host on WPGC's official Instagram page for Monday – Saturday from 6:00-10:00 p.m.

78.     Plaintiff was treated less favorably than Mr. Johnson because of her sex and Entercom unlawfully constructively discharged Plaintiff and ended her employment with Entercom for complaining about sexual harassment, sexual assault, hostile work environment and discrimination.

<u>COUNT I</u>
**Title VII--Sexual Harassment/Hostile Work Environment/Sex Discrimination**

79.     Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations in the preceding paragraphs, as fully set forth herein.

80.     Defendants' conduct and that of its agents, employees and/or servants, constituted a hostile work environment caused by sexual harassment, which was unwelcomed by Plaintiff. The conduct was sufficiently severe and pervasive as to alter the conditions of Plaintiff's employment with Entercom.

81.     At all times relevant to Plaintiff's allegations, Mr. Johnson was an agent, employee and/or servant to Defendants.

82.     The harassing conduct that Defendants permitted to occur, including not responding to Plaintiff's complaints, permitted Plaintiff to be physically touched in a sexual manner and being subjected to unwanted and unwelcomed sexual attention created a hostile and abusive work environment.

83.     Defendants failed to take appropriate and remedial action against Mr. Johnson.

84.     Plaintiff's working conditions were intolerable.  Rather than address Plaintiff's complaints, Defendants retaliated against Plaintiff, constructively discharging her thus causing a

loss of pay and other benefits.

85.     Entercom's unlawful adverse actions materially affected the terms, privileges and conditions of Plaintiff's employment.  A "researcher" was an assistant position that did not provide Plaintiff the same opportunity to work in the radio studio as a producer of a programming nor did it provide Plaintiff the same opportunity for professional exposure or growth.

86.     Plaintiff was subjected to sexual harassment on an on-going basis.

87.     And, to avoid addressing the unlawful behavior of on-air talent, Mr. Johnson, Defendants constructively discharged Plaintiff.

88.     As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of income, personal and professional embarrassment, loss of professional opportunities, emotional distress, including nightmares, depressive episodes, panic attacks, sleeplessness, humiliation, anxiety, and fear of retaliation including on social media.

89.     Plaintiff's emotional distress has damaged her.

90.     Entercom's conduct was intentional, deliberate, willful, malicious, reckless and in callous disregard of the law in its treatment of Plaintiff and her rights.

91.     Defendants discriminated against Plaintiff by engaging in, tolerating or failing to prevent discrimination and sexual harassment and by failing to take action to correct and/or redress the unlawful employment practices perpetrated against Plaintiff.

WHEREFORE, Plaintiff asks this Honorable Court for a judgment against Defendants:

A.  Declaring that the acts of Defendants violate Title VII;

B.  Enjoining and permanently restraining Defendants and their agents, servants and
    employees from violating Title VII;

C. Directing that Defendants take such affirmative action as is necessary to ensure that these unlawful employment practices are eliminated and do not continue;

D. Directing Defendants to reinstate Plaintiff to a position she would have had but for Defendants' discriminatory practices and retaliation, or in the alternative to provide her with appropriate front pay, in an amount to be determined at trial;

E. Directing Defendants to pay full back pay for the amount of wages, earnings, and other employee benefits Plaintiff would have received but for Defendant's discriminatory treatment;

F. Awarding Plaintiff compensatory damages for emotional distress, costs and expenses incurred by Plaintiff as a result of Defendants' unlawful conduct, in an amount to be determined at trial;

G. Awarding Plaintiff pre-judgment and post-judgment interest and the costs of this action, including reasonable attorneys' fees;

H. Awarding punitive damages due to Defendants' malicious and intentional or callously and recklessly indifferent conduct in an amount appropriate to proof at trial; and

I. Granting such other or further relief as this Court deems necessary and proper.

## <u>COUNT II</u>
### Title VII—Retaliation

92. Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations in the preceding paragraphs, as fully set forth herein.

93. Plaintiff complained to her supervisors regarding the conduct of Defendants' agent, employee and/or servant, Mr. Johnson.

94. Plaintiff reported the repeated sexual harassment and sexual contact by Mr. Johnson.

95.     As a result, Plaintiff was subjected to an adverse employment action and she was constructively discharged.

96.     As a proximate result of Defendants' wrongful acts, Plaintiff suffered a loss of pay and will continue to suffer a loss of pay.

97.     Defendants failed to take appropriate and remedial action against Mr. Johnson for his unlawful behaviors, and instead constructively discharged Plaintiff.  Defendants acted with malice or with reckless or callous indifference towards Plaintiff.

98.     Entercom's unlawful adverse actions materially affected the terms, privileges and conditions of her employment as she was constructively discharged.

99.     As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of income, personal and professional embarrassment, loss of professional opportunities, emotional distress, including nightmares, depressive episodes, panic attacks, sleeplessness, humiliation, anxiety, and fear of retaliation including on social media.

100.     Plaintiff's emotional distress has damaged her, including financially.

101.     Entercom's retaliatory conduct was intentional, deliberate, willful, malicious, reckless and in callous disregard of the law in its treatment of Plaintiff and of the rights of Plaintiff.

WHEREFORE, Plaintiff asks this Honorable Court for a judgment against Defendants:

A.  Declaring that the acts of Defendants violate Title VII;

B.  Enjoining and permanently restraining Defendants and their agents, servants and employees from violating Title VII;

C.  Directing that Defendants take such affirmative action as is necessary to ensure that these unlawful employment practices are eliminated and do not continue;

D.  Directing Defendants to reinstate Plaintiff to a position she would have had but for Defendants' discriminatory practices and retaliation, or in the alternative to provide her with appropriate front pay, in an amount to be determined at trial;

E.  Directing Defendants to pay full back pay for the amount of wages, earnings, and other employee benefits Plaintiff would have received but for Defendant's discriminatory treatment;

F.  Awarding Plaintiff compensatory damages for emotional distress, costs and expenses incurred by Plaintiff as a result of Defendants' unlawful conduct, in an amount to be determined at trial;

G.  Awarding Plaintiff pre-judgment and post-judgment interest and the costs of this action, including reasonable attorneys' fees;

H.  Awarding punitive damages due to Defendants' malicious and intentional or callously and recklessly indifferent conduct in an amount appropriate to proof at trial; and

I.  Granting such other or further relief as this Court deems necessary and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues set forth herein.

Respectfully submitted,

 /S/ M. Celeste Bruce, Esq.
M. Celeste Bruce, Bar ID 438343
Rifkin Weiner Livingston LLC
4800 Hampden Lane, Suite 820
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Telecopier: (301) 951-0172
Email: cbruce@rwllaw.com